2012 SEP 25  AM 9: 51

CLEVELAND OHIO

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FEDERAL TRADE COMMISSION,          )   Case No. **1:12CV2394**
                                   )
    Plaintiff,                     )
                                   )   **JUDGE GWIN**
    v.                             )
                                   )   **COMPLAINT FOR PERMANENT**
E.M.A. NATIONWIDE, INC., a Florida )   **INJUNCTION AND OTHER**
    corporation, also d/b/a EMA and Expense )  **EQUITABLE RELIEF**
    Management America,            )
                                   )
NEW LIFE FINANCIAL SOLUTIONS, INC., )
    a Florida corporation, also d/b/a New Life )
    Financial, and New Life Financial Services, )
                                   )
1UC Inc., a Wyoming corporation, also d/b/a )   **MAG. JUDGE McHARGH**
    1ST United Consultants, and First United )
    Consultants,                   )
                                   )
7242701 CANADA INC., a Canadian    )
    corporation,                   )
                                   )
7242697 CANADA INC., a Canadian    )
    corporation,                   )
                                   )
7246293 CANADA INC., a Canadian    )
    corporation,                   )
                                   )
7246421 CANADA INC., a Canadian    )
    corporation,                   )
                                   )
JAMES BENHAIM, a/k/a Jimmy Benhaim, )

individually and as an officer or director of )
E.M.A. Nationwide, Inc., New Life )
Financial Solutions, Inc., 1UC Inc., )
7246293 Canada Inc., 7246421 Canada Inc., )
and 7242697 Canada Inc., )
)
DANIEL MICHAELS, a/k/a Dan Michaels, )
a/k/a Dan Michles, individually and as an )
officer or director of E.M.A. Nationwide, )
Inc., New Life Financial Solutions, Inc., )
1UC Inc., and 7242701 Canada Inc., )
)
PHILLIP HEE MIN KWON, a/k/a Phillip H. )
Kwon, individually and as an officer or )
director of E.M.A. Nationwide, Inc. and )
New Life Financial Solutions, Inc., )
)
JOSEPH SHAMOLIAN, individually and as an )
officer or director of E.M.A. Nationwide, )
Inc. and New Life Financial Solutions, Inc., )
)
and )
)
NISSIM N. OHAYON, individually and as an )
officer or director of E.M.A. Nationwide, )
Inc., New Life Financial Solutions, Inc., and )
1UC Inc., )
)
_____Defendants._____ )

Plaintiff, the Federal Trade Commission ("FTC"), for its complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Telemarketing and Consumer

Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6101 *et seq.*, and the 2009

Omnibus Appropriations Act, Public Law 111-8, Section 626, 123 Stat. 524, 678 (Mar. 11, 2009)

("Omnibus Act"), as clarified by the Credit Card Accountability Responsibility and Disclosure

Act of 2009, Public Law 111-24, Section 511, 123 Stat. 1734-64 (May 22, 2009) ("Credit Card

Act"), and amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act,

Public Law 111-203, Section 1097, 124 Stat. 1376, 2102-03 (July 21, 2010) ("Dodd-Frank Act"), 12 U.S.C. § 5538, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and the Mortgage Assistance Relief Services Rule, 16 C.F.R. Part 322 ("MARS Rule"), recodified as Mortgage Assistance Relief Services, 12 C.F.R. Part 1015 ("Regulation O"), in connection with the marketing and sale of debt relief services, and mortgage assistance relief services ("MARS").

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345; 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b); and Section 626 of the Omnibus Act, as clarified by Section 511 of the Credit Card Act, and amended by Section 1097 of the Dodd-Frank Act, 12 U.S.C. § 5538.

3.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.     The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. § 6101 *et seq.* Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices. In addition, the FTC enforces the MARS Rule, 16 C.F.R. Part 322, effective December 29, 2010, and its recodification as Regulation O, 12 C.F.R. Part 1015, effective December 30, 2011. Dodd-Frank Act § 1097, 12 U.S.C. § 5538. Among other things, the MARS Rule and Regulation O require MARS providers to make certain

3

disclosures, prohibit MARS providers from making certain representations, and, effective January 31, 2011, prohibit MARS providers from collecting a fee in advance of the consumer's acceptance of mortgage assistance relief obtained by the MARS provider.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the TSR, the MARS Rule, and Regulation O, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 57b, 6102(c), and 6105(b); and § 626, 123 Stat. 678, as clarified by § 511, 123 Stat. 1763-64 and amended by § 1097, 124 Stat. at 2102-03, 12 U.S.C. § 5538.

## DEFENDANTS

6.      Defendant E.M.A. Nationwide, Inc. ("EMA"), is a Florida and California corporation. Its registered address is 1444 Biscayne Blvd., Suite 213, Miami, FL 33132. It also has used the addresses 800 Parkview Drive, #222, Hallandale Beach, FL 33009 and 28310 Roadside Drive, Suite 155, Agoura Hills, CA 91301. EMA also does business as E.M.A. and Expense Management America, and it transacts or has transacted business in this district and throughout the United States.

7.      Defendant New Life Financial Solutions, Inc. ("New Life"), is a Florida and California corporation. Its registered address is 1444 Biscayne Blvd., Suite 213, Miami, FL 33132. It also has used the addresses 800 Parkview Drive, #222, Hallandale Beach, FL 33009 and 28310 Roadside Drive, Suite 155, Agoura Hills, CA 91301. New Life also does business as New Life Financial and New Life Financial Services, and it transacts or has transacted business in this district and throughout the United States.

8.      1UC Inc. ("1st United"), is a Wyoming corporation. Its business address is 800 Parkview Drive, #222, Hallandale Beach, FL 33009. 1st United has done business as 1st United

Consultants and First United Consultants, and it transacts or has transacted business in this district and throughout the United States.

9.      Defendant 7242701 Canada Inc. is a Montréal, Canada corporation.  Its registered address is 75 Rue Queen, Suite 6600, Montréal, Québec, H3C 2N6.  Its correspondence office address is 500, Place D'Armes, Bureau 2920, Montréal, Québec H2Y 2W2.

10.     Defendant 7242697 Canada Inc. is a Montréal, Canada corporation.  Its registered address is 75 Rue Queen, Suite 6600, Montréal, Québec, H3C 2N6.  Its correspondence office address is 500, Place D'Armes, Bureau 2920, Montréal, Québec H2Y 2W2.

11.     Defendant 7246293 Canada Inc. is a Montréal, Canada corporation.  Its registered address and its correspondence office address are both 75 Rue Queen, Suite 6600, Montréal, Québec, H3C 2N6.

12.     Defendant 7246421 Canada Inc. is a Montréal, Canada corporation.  Its registered address and its correspondence office address are both 75 Rue Queen, Suite 6600, Montréal, Québec, H3C 2N6.  It has also done business as "EMA."  (Together with Defendants 7242701 Canada Inc., 7242697 Canada Inc., and 7246293 Canada Inc., the "Montréal Corporations.")

13.     Defendant James Benhaim, also known as Jimmy Benhaim ("Benhaim"), is an officer of EMA, New Life, 1st United, 7242697 Canada Inc., 7246293 Canada Inc., and 7246421 Canada Inc.  At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Benhaim, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14.     Defendant Daniel Michaels, also known as Dan Michles ("Michaels"), is an officer of EMA, New Life, 1st United, and 7242701 Canada Inc.  At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

Defendant Michaels, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

15.     Defendant Phillip Hee Min Kwon, also known as Phillip H. Kwon ("Kwon"), is or was an officer of EMA and New Life.  At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of EMA and New Life, including the acts and practices set forth in this Complaint.  Defendant Kwon, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

16.     Defendant Joseph Shamolian ("Shamolian") is or was an owner and officer of EMA and New Life.  At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of EMA and New Life, including the acts and practices set forth in this Complaint.  Defendant Shamolian, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

17.     Defendant Nissim N. Ohayon ("Ohayon"), is or was an officer of EMA, New Life, and 1st United.  At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of EMA, New Life, and 1st United, including the acts and practices set forth in this Complaint.  Defendant Ohayon, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

18.     Defendants EMA, New Life, 1st United and the Montréal Corporations (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts or practices and other violations of law alleged below.  Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that commingled funds.  Because these Corporate Defendants have operated as a

common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendants Benhaim, Michaels, Kwon, Shamolian, and Ohayon have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## SUMMARY OF COMPLAINT

19. Since at least June 2010, through at least three different iterations – EMA, New Life, and now, 1st United – Defendants have marketed and sold debt-related services, including debt settlement, loan modification, and mortgage assistance relief services, to consumers nationwide, primarily through the cold-calling telemarketing activities of Defendants' Montréal-based outbound call center. Defendants even call consumers whose phone numbers have been registered with the Do Not Call Registry. Defendants attract distressed consumers via phone calls, deceptively promising substantial relief from unaffordable debt, including mortgages, and possible foreclosures. Defendants offer a substantial reduction in consumers' monthly payments (and outstanding principal amounts), but rather than helping consumers address their debt-related challenges, Defendants dupe distressed consumers into paying thousands of dollars based on false promises and misrepresentations. Defendants mislead consumers into thinking that their services come at little or no cost, and that consumers' payments will be held in escrow pending resolution of debt settlement agreements with their creditors. In reality, much, if not all, of these payments are taken by Defendants up-front, as their undisclosed fee. In the end, Defendants provide little, if any, meaningful assistance to resolve consumers' debt, and consumers are left worse off after signing up – and paying – for Defendants' services.

## COMMERCE

20. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

7

## DEFENDANTS' BUSINESS ACTIVITIES

21.     Since at least mid-2010, Defendants have marketed their debt-related services to consumers and homeowners who are in financial distress, behind on their secured and unsecured loans, and, in some cases, in danger of losing their homes to foreclosure.  Since at least mid-2010, Defendants have initiated outbound telephone calls to numbers on the National Do Not Call Registry.

22.     During Defendants' calls with consumers, they offer to solve all of the consumers' financial problems by reducing applicable interest rates, reducing outstanding principal amounts, reducing monthly payments, and generally improving consumers' financial positions.

23.     Defendants tell consumers that through their experience and connection with various lenders, and their ability to negotiate on behalf of many consumers at the same time, Defendants will be able to do what the consumers are unable to do – obtain real results and secure debt settlements, loan modifications, and mortgage loan relief that would otherwise be unavailable to consumers.

24.     Defendants tailor their pitch to consumers depending on the individual consumer's financial situation.  If the consumer is having trouble with a mortgage, Defendants claim they can help.  If the consumer is behind on credit card or student loan debts, Defendants say they have an answer.  Even if the consumer is behind on car loans or suffers from a poor credit score, Defendants present themselves as the solution to all of the consumer's financial problems.

25.     Defendants collect basic financial information from consumers, including the amounts of outstanding debt, the type of debt, and, in some cases, the creditor to whom the debt is owed.  Defendants also collect some personal information about the consumer, including name and address, and, in some cases, part or all of the consumer's Social Security number.  In some

8

cases, Defendants utilize free credit reporting services and access the consumer's credit report without their knowledge or consent.

26.     After briefly placing the consumer on hold, Defendants return to the line and congratulate the consumer. "Congratulations!  You've been approved for our program!"  No matter how much debt is owed (as long as it isn't too little), and no matter which creditor is involved, Defendants offer consumers a new, lower monthly payment, which Defendants claim will be held in a special purpose account and, when the balance is high enough, will be used to pay off outstanding debts at a fraction of what is owed.

27.     In numerous instances, Defendants assure consumers that their "approval" virtually guarantees that creditors will modify the consumers' outstanding debts.  In numerous instances, Defendants claim to have an incredible track record of success, and Defendants claim that they are paid either a very small fee for processing each payment, or no fee from consumers, but rather Defendants claim to be paid by the consumers' creditors.

28.     Defendants also instruct consumers to stop paying their creditors directly, and Defendants give specific instruction that consumers should not speak to their creditors if they call.  Defendants are careful to limit use of U.S. Postal Service delivery for the contract or any other materials or payments.

29.     Although the pitch remains the same, Defendants have used at least three different company names in their deceptive and illegal scheme -- EMA, New Life, and now, 1st United.  While the names, websites, and contractual language varies somewhat between companies, the deception, and the failure to produce any of the promised results, is consistent.

Defendant EMA

30.     Beginning in or around June 2010 through around December 2010, EMA marketed its services primarily through the cold-calling techniques described above -- like the other Corporate Defendants.  EMA's website and documents provided to consumers after they sign up reinforced the Defendants' claims and promises of financial relief.

9

31.    EMA's website marketed its "forensic mitigation program" services, the purpose of which is to "help [consumers] with [their] financial situation and settle [their] debts for a substantially lower amount than [they] currently owe."

32.    EMA's website contained statements that induced consumers to purchase Defendants' services, including the following:

   a. "Generally, we reduce your debt by 50-70% of the current total."

   b. "EMA negotiates with your creditors to substantially reduce your debt and help put a stop to collector calls and harassment."

   c. "We arrange a settlement with one low monthly payment for you with no upfront fee."

   d. "Through the established relationships that we have with the creditors and financial institutions, we are able to successfully negotiate the debts of our clients at a substantial discount."

   e. "Any and all fees associated with the program are built in to your comfortable monthly payment and fully absorbed by the interest savings."

33.    When consumers signed up with EMA, they received an email containing a contract between the consumer and EMA, as well as an agreement between the consumer and EMA's payment processor, NoteWorld Servicing Center (later known as Meracord) ("Meracord") granting Meracord permission to electronically withdraw payments from the consumer's checking account at specified dates and amounts.  The consumer was instructed to electronically "sign" the contract and begin the process.

34.    After signing up with EMA, the consumer was sent an "Expense Management Guide" by email.  The Guide contains approximately 40 pages of basic financial advice, budgeting exercises, and templates for letters to send to creditors.  It also repeatedly reminds the consumer of "The **GOLDEN RULE THAT YOU MUST FOLLOW**," which is, "**LET E.M.A. DO THE TALKING FOR YOU**." (Emphasis in original.)  The Guide also warns:

10

a. "Sometimes [creditors will] go to extremes in an attempt to force you into an agreement by saying things such as, 'We've never heard of E.M.A.' or 'We don't deal with them.'. . . Sometimes [creditors] even break the law.  Don't be fooled by them.  **Let E.M.A. do the talking!**"

b. "Rely on our experience and expertise: we have your best interests at heart."

(Emphasis in original.)

### Defendant New Life

35.     Defendants continued to deceptively market their services in their second iteration – New Life – from approximately December 2010 until approximately March 2012.

36.     Like EMA, New Life used telemarketers to cold-call consumers and promise all kinds of financial relief – reduced outstanding principal, reduced interest rates, and reduced monthly payments.

37.     Like EMA, New Life's website and contracts reinforced New Life's deceptive claims.  New Life's website included the following:

a. "[New Life's] goal is to provide a **safe and secure place for consumers to seek financial relief**."

b. "Our **financial consultants** . . . will assist you in creating a tailor-made plan to **reduce the burden on you and your family**."

c. "New Life does exactly what its name suggests and provides **solutions to give you a new life** and **set you on the path to success**."

(Emphasis in original.)

38.     New Life's website also offered 28 "testimonials" that "are but a few examples of the successes that can occur. . . ."  The "testimonials" were copies of letters from creditors purporting to show incredible reductions in outstanding principal amounts of debts, and they boast savings of up to 86%, dating back as far as 2005.

11

39.     Like EMA, New Life dealt with consumers almost exclusively through telephone and email, and when consumers signed up with New Life they received a contract and "Debt Appraisal Guide."  Consumers electronically signed the contract with New Life (and the included contract with Meracord for payment processing), and began making payments directly to New Life.

40.     New Life instructed consumers not to pay their creditors directly, and the "Debt Appraisal Guide" states, **"DO NOT SPEAK TO YOUR CREDITORS UNTIL YOU HAVE MAPPED OUT A CLEAR SOLUTION TO THE PROBLEM!"** (Emphasis in original.)

41.     New Life told consumers that they needed to make payments for a specific number of months – usually between four and ten – and that these funds would be used to settle with the consumers' creditors.  In fact, however, in virtually all cases when the consumers made all of the scheduled payments, New Life informed the consumers that they had successfully paid New Life's fee in full, and New Life referred consumers to third parties who attempted to charge a second fee for the debt settlement, loan modification, and/or mortgage relief services.

42.     Many consumers who complained to New Life received no relief and rarely received a return call.

43.     By this time, consumers were several months behind on their payments to creditors, and they had lost all of the money paid to New Life, with nothing to show for it.

<u>Defendant 1st United</u>

44.     Started in approximately December 2011, Defendants' latest – and current – iteration is 1st United.  Like its predecessors, 1st United uses the deceptive telemarketing tactics described above.

45.     1st United's website states:

a.   "Whether you are struggling with: Mortgage Payments; Credit Cards; Monthly Budget; Medical Bills; Student Loans; Personal Loans; Tax Debt

Our job is to provide you savings, which in turn give you more disposable income, which means more options for eliminating your debt and reducing your monthly output dramatically!"

b. "If saving money is for you, our financial consultants will work tirelessly to ensure that you are put on the road to financial stability."

46.   The website also provides testimonials:

a. "Yay for 1st united!!! You helped me do what others have been trying to for years.  I admit, I wasn't sure how you would help but after all is said and done and my monthly payments are down by $1000 a month, I have to say Kudos!"

b. "When you guys called me my first question was 'Are there any fees?' Steven told me that there are fees and that even with fees I will still be saving 35% on my bills, he told me that aside from the fees I needed to be concerned with the savings and he was right, despite the fees I was saving 800$ a month. He explained that 1st United lowers my payments on the first month and they go even lower on the 5th or 6th month."

47.   In numerous instances, as with EMA and New Life, 1st United collects consumers' payments without providing the promised results.

## CONSUMER RESULTS

48.   In numerous instances, consumers who pay fees to Defendants do not obtain loan modifications or have their debt or mortgage payments or principal amounts substantially reduced.

49.   In numerous instances, when consumers contact Defendants for status updates, Defendants fail to answer or return consumers' telephone calls or emails.  When consumers are able to reach Defendants, Defendants' salespersons generally assure consumers that their files are being handled.

50.    In numerous instances, consumers learn from their creditors that the creditors have never been contacted by Defendants.

51.    In numerous instances, consumers enrolled in Defendants' programs have suffered significant economic injury, including: monetary losses ranging from $2,200 or lower to $10,000 or higher and receiving little or no service in return; going into foreclosure; and even losing their homes.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

52.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts and practices in or affecting commerce."

53.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I

54.    In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, sale, or performance of debt relief services, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants generally will obtain for consumers debt settlements that will make consumers' payments substantially more affordable.

55.    In truth and in fact, the representations set forth in Paragraph 54 of this Complaint are false or were not substantiated at the time the representations were made.

56.    Therefore, the making of the representations, as set forth in Paragraph 54, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II

57.    In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, sale, or performance of debt relief services, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants generally will obtain for

consumers reductions in outstanding principal amounts that will substantially reduce the amount of debt the consumers owe.

58.     In truth and in fact, the representations set forth in Paragraph 57 of this Complaint are false or were not substantiated at the time the representations were made.

59.     Therefore, Defendants' representation as set forth in Paragraph 57 is false or unsubstantiated and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

Count III

60.     In numerous instances, in connection with the offering and sale of mortgage assistance relief services, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants will obtain for consumers mortgage loan modifications that will make consumers' payments substantially more affordable.

61.     In truth and fact, Defendants generally do not obtain for consumers mortgage loan modifications that make consumers' payments substantially more affordable.

62.     Therefore, Defendants' representation as set forth in Paragraph 60 is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

THE TELEMARKETING SALES RULE

63.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*., in 1994. The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amending it in 2003, and amended certain sections thereafter.

64.     As amended, effective September 27, 2010, and October 27, 2010, the TSR addresses the telemarketing of debt relief services. The amendments effective September 27, 2010, among other things, prohibit misrepresentations about material aspects of debt relief services and require certain disclosures in promoting debt relief services. The amendments

effective October 27, 2010, prohibit sellers and telemarketers from charging or collecting an advance fee before renegotiating, settling, reducing, or otherwise altering consumers' debts.

65. Defendants are "seller[s]" or "telemarketer[s]" engaged in telemarketing" as those terms are defined in the TSR, 16 C.F.R. § 310.2(aa), (cc), and (dd). Defendants are also sellers or telemarketers of "debt relief services," as defined by the TSR, 16 C.F.R. § 310.2(m).

66. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any of the following material information:

    a. The total costs to purchase, receive, or use any goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(i);

    b. Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii); and

    c. Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service, and other material aspects set forth in 16 C.F.R. § 310.3(a)(2)(x).

67. The TSR also prohibits requesting or receiving payment of any fee or consideration for any debt relief service before the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer, among other requirements contained in 16 C.F.R. § 310.4(a)(5)(i).

68. The TSR also prohibits initiating an outbound telephone call to a person who has registered his or her telephone number on the "do-not-call" registry, maintained by the FTC, unless certain exceptions set forth in 16 C.F.R. § 310.4(b)(1)(iii)(B)(i) and (ii) apply.

69. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an

unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### Count IV

70.     In numerous instances in the course of telemarketing goods and services, Defendants have misrepresented, directly or by implication, the total costs to purchase, receive, or use Defendants' services.

71.     Defendants' acts or practices, as alleged in Paragraph 70 above, violate Section 310.3(a)(2)(i) of the TSR, 16 C.F.R. § 310.3(a)(2)(i).

### Count V

72.     In numerous instances in the course of telemarketing goods and services, Defendants have misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of such goods and services, including, but not limited to, the amount of money or the percentage of the debt amount that customers will save by using Defendants' services.

73.     Defendants' acts or practices, as alleged in Paragraph 72 above, violate Section 310.3(a)(2)(iii) of the TSR, 16 C.F.R. § 310.3(a)(2)(iii).

### Count VI

74.     In numerous instances, including on or after September 27, 2010, in the course of telemarketing debt relief services, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of the debt relief services, including, but not limited to, the amount of money or the percentage of the debt amount that consumers will save by using Defendants' services.

75.     Defendants' acts or practices, as alleged in Paragraph 74 above, violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x).

## Count VII

76.     In numerous instances on or after October 27, 2010, in connection with the telemarketing of debt relief services, Defendants have requested and received payments of fees or consideration for debt relief services:

     a.  before (1) they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (2) the customer has made at least one payment pursuant to that agreement; and/or

     b.  to the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either (1) does not bear the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount, or (2) is not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration and that percentage does not change from one individual debt to another.

77.     Defendants' acts or practices, as alleged in Paragraph 76 above, are abusive telemarketing acts or practices that violate Section 310.4(a)(5)(i) of the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## Count VIII

78.     In numerous instances, in connection with telemarketing, Defendants have initiated or caused others to initiate, an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## THE MORTGAGE ASSISTANCE RELIEF SERVICES RULE

79.     In 2009, Congress directed the FTC to prescribe rules prohibiting unfair or deceptive acts or practices with respect to mortgage loans. Omnibus Act § 626, 123 Stat. 678, as clarified by Credit Card Act § 511, 123 Stat. 1763-64. Pursuant to that direction, the FTC promulgated the MARS Rule, 16 C.F.R. Part 322, all but one of the provisions of which became effective on December 29, 2010. The remaining provision, Section 322.5, became effective on January 31, 2011. The Dodd-Frank Act §1097, 124 Stat. at 2102-03, 12 U.S.C. § 5538, transferred rulemaking authority over the MARS Rule to the Consumer Financial Protection Bureau, which recodified the Rule as 12 C.F.R. Part 1015 effective December 30, 2011, and designated it "Regulation O." The FTC retains authority to enforce the MARS Rule pursuant to Dodd-Frank Act § 1097, 12 U.S.C. 5538.

80.     The MARS Rule and Regulation O define "mortgage assistance relief provider" as "any person that provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service" other than the dwelling loan holder, the servicer of a dwelling loan, or any agent or contractor of such individual or entity. 16 C.F.R. § 322.2(j), recodified as Regulation O, 12 C.F.R. § 1015.2.

81.     Defendants are "mortgage assistance relief providers" or "providers" engaged in providing "mortgage assistance relief services" as those terms are defined in the MARS Rule, 16 C.F.R. § 322.2(i) and (j), recodified as Regulation O, 12 C.F.R. § 1015.2.

82.     The MARS Rule and Regulation O prohibit any mortgage assistance relief provider from representing, expressly or by implication, in connection with the advertising, marketing, promotion, offering for sale, sale, or performance of any mortgage assistance relief service, that a consumer cannot or should not contact or communicate with his or her lender or servicer. 16 C.F.R. § 322.3(a), recodified as Regulation O, 12 C.F.R. § 1015.3(a).

83.     The MARS Rule and Regulation O prohibit any mortgage assistance relief provider from misrepresenting, expressly or by implication, any material aspect of any mortgage assistance relief service, including but not limited to the following:

    a.   The likelihood of negotiating, obtaining, or arranging any represented service or result.  16 C.F.R. § 322.3(b)(1), recodified as Regulation O, 12 C.F.R. § 1015.3(b)(1); or

    b.   The total cost to purchase the mortgage assistance relief services.  16 C.F.R. § 322.3(b)(11), recodified as Regulation O,  12 C.F.R. § 1015.3(b)(11).

84.     The MARS Rule and Regulation O prohibit any mortgage assistance relief provider from making a representation, expressly or by implication, about the benefits, performance, or efficacy of any mortgage assistance relief service unless, at the time such representation is made, the provider possesses and relies upon competent and reliable evidence that substantiates that the representation is true.  16 C.F.R. § 322.3(c), recodified as Regulation O, 12 C.F.R. § 1015.3(c).

85.     The MARS Rule and Regulation O prohibit any mortgage assistance relief service provider from failing to place the following statements in every general commercial communication:

    a.   "(Name of company) is not associated with the government, and our service is not approved by the government or your lender."  16 C.F.R. § 322.4(a)(1), recodified as Regulation O, 12 C.F.R. § 1015.4(a)(1); and

    b.   In cases where the mortgage assistance relief service provider has represented, expressly or by implication, that consumers will receive any mortgage assistance relief service or result, "[e]ven if you accept this offer and use our service, your lender may not agree to change your loan."  16 C.F.R. § 322.4(a)(2), recodified as Regulation O, 12 C.F.R. § 1015.4(a)(2).

86.     The MARS Rule and Regulation O prohibit any mortgage assistance relief service provider from failing to disclose the following information in every consumer-specific commercial communication:

a. "You may stop doing business with us at any time.  You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer].  If you reject the offer, you do not have to pay us.  If you accept the offer, you will have to pay us (insert amount or method for calculating the amount) for our services."   16 C.F.R. § 322.4(b)(1), recodified as Regulation O, 12 C.F.R. 1015.4(b)(1);

b. "(Name of company) is not associated with the government, and our service is not approved by the government or your lender."   16 C.F.R. § 322.4(b)(2), recodified as Regulation O, 12 C.F.R. § 1015.4(b)(2); and

c. In cases where the mortgage assistance relief service provider has represented, expressly or by implication, that consumers will receive the provider's service or result, "[e]ven if you accept this offer and use our service, your lender may not agree to change your loan." 16 C.F.R. § 322.4(b)(3), recodified as Regulation O, 12 C.F.R. § 1015.4(b)(3).

87.     The MARS Rule and Regulation O prohibit any mortgage assistance relief service provider, in cases where the provider has represented, expressly or by implication, in connection with the advertising, marketing, promotion, offering for sale, sale, or performance of any mortgage assistance relief service, that the consumer should temporarily or permanently discontinue payments, in whole or in part, on a dwelling loan, from failing to disclose, clearly and prominently, and in close proximity to any such representation, that "[i]f you stop paying your mortgage, you could lose your home and damage your credit rating." 16 C.F.R. § 322.4(c), recodified as 12 C.F.R. § 1015.4(c).

21

88.     The MARS Rule and Regulation O prohibit any mortgage assistance relief provider from requesting or receiving payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder or servicer incorporating the offer of mortgage assistance relief the provider obtained from the consumer's dwelling loan holder or servicer. 16 C.F.R. § 322.5(a), recodified as 12 C.F.R. § 1015.5(a).

89.     Pursuant to the Omnibus Act § 626, 123 Stat. at 678, as clarified by the Credit Card Act § 511, 123 Stat. at 1763-64 and amended by the Dodd-Frank Act § 1097, 124 Stat. at 2102-03, 12 U.S.C. § 5538, and pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the MARS Rule and Regulation O constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count IX

90.     In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, sale, or performance of any mortgage assistance relief service, Defendants have requested or received payment of a fee or other consideration before the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder or servicer incorporating the offer of mortgage assistance relief the Defendants obtained from the consumer's dwelling loan holder or servicer.

91.     Defendants' practices as alleged in Paragraph 90 above are unfair or deceptive acts or practices that violate Section 322.5(a) of the MARS Rule, 16 C.F.R. § 322.5(a) and Regulation O, 12 C.F.R. § 1015.5(a).

### Count X

92.     In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, sale, or performance of any mortgage assistance relief service, Defendants have

represented, expressly or by implication, that a consumer cannot or should not contact or communicate with his or her lender or servicer.

93.     Defendants' practices as alleged in Paragraph 92 above are unfair or deceptive acts or practices that violate Section 322.3(a) of the MARS Rule, 16 C.F.R. § 322.3(a), and Regulation O, 12 C.F.R. § 1015.3(a).

### Count XI

94.     In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, sale, or performance of any mortgage assistance relief service, Defendants have misrepresented, expressly or by implication, material aspects of those services, including, but not limited to:

    a.  Defendants' likelihood of obtaining a modification of mortgage loans for consumers that will make their payments substantially more affordable; or

    b.  The total cost to purchase the mortgage assistance relief services.

95.     Defendants' practices as alleged in Paragraph 94 above are unfair or deceptive acts or practices that violate Sections 322.3(b)(1) and (11) of the MARS Rule, 16 C.F.R. § 322.3(b)(1) and (11), and Regulation O, 12 C.F.R. § 1015.3(b)(1) and (11).

### Count XII

96.     In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, sale, or performance of any mortgage assistance relief service, Defendants have failed to make the following disclosures:

    a.  in all general commercial communications –

        i.  "(Name of company) is not associated with the government, and our service is not approved by the government or your lender," in violation of the MARS Rule, 16 C.F.R. § 322.4(a)(1), and Regulation O, 12 C.F.R. § 1015.4(a)(1); and

      ii.  "Even if you accept this offer and use our service, your lender may not agree to change your loan," in violation of the MARS Rule, 16 C.F.R. § 322.4(a)(2), and Regulation O, 12 C.F.R. § 1015.4(a)(2);

  b.  in all consumer-specific commercial communications –

      i.  "You may stop doing business with us at any time.  You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer].  If you reject the offer, you do not have to pay us.  If you accept the offer, you will have to pay us (insert amount or method for calculating the amount) for our services," in violation of the MARS Rule, 16 C.F.R. § 322.4(b)(1), and Regulation O, 12 C.F.R. § 1015.4(b)(1);

      ii.  "(Name of company) is not associated with the government, and our service is not approved by the government or your lender," in violation of the MARS Rule, 16 C.F.R. § 322.4(b)(2), and Regulation O, 12 C.F.R. § 1015.4(b)(2); and

      iii.  "Even if you accept this offer and use our service, your lender may not agree to change your loan," in violation of the MARS Rule, 16 C.F.R. § 322.4(b)(3), and Regulation O, 12 C.F.R. § 1015.4(b)(3); and

  c.  in all general communications, consumer-specific commercial communications, and other communications in cases where Defendants have represented, expressly or by implication, in connection with the advertising, marketing, promotion, offering for sale, sale, or performance of any mortgage assistance relief service, that the consumer should temporarily or permanently discontinue payments, in whole or in part, on a dwelling loan, clearly and prominently, and in close proximity to any such representation that "[i]f you stop paying your mortgage, you could lose your home and damage your credit

rating," in violation of the MARS Rule, 16 C.F.R. § 322.4(c), and Regulation O, 12 C.F.R. § 1015.4(c).

## CONSUMER INJURY

97.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and the MARS Rule.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts and practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

98.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

99.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including rescission or reformation of contracts, and the refund of money.

100.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 626 of the Omnibus Act, respectively, authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the MARS Rule/Regulation O, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), the Omnibus Act, and the Court's own equitable powers, requests that the Court:

A.  Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, appointment of a receiver over the corporate Defendants, and an order freezing assets;

B.  Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the MARS Rule/Regulation O by Defendants;

C.  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, and the MARS Rule/Regulation O, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.  Award Plaintiff the costs of bringing this action, as well as such other and additional relief the Court may determine to be just and proper.

Dated: _September 25_, 2012

Respectfully submitted,
**WILLARD K. TOM**
General Counsel

**JON MILLER STEIGER**
Director, East Central Region

CHRISTOPHER D. PANEK (OH Bar 0080016)
SARA C. DEPAUL (OH Bar 0077829)
Federal Trade Commission
East Central Region
1111 Superior Avenue, East, Suite 200
Cleveland, Ohio 44114
Phone:  (216) 263-3406 (Panek)
Fax:  (216) 263-3426
*cpanek@ftc.gov*
*sdepaul@ftc.gov*

Attorneys for Federal Trade Commission