UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                        :
FEDERAL TRADE COMMISSION,               :       CASE NO. 1:12-CV-2394
                                        :
            *Plaintiff*,                :
                                        :
vs.                                     :       AMENDED OPINION &
                                        :       ORDER
E.M.A. NATIONWIDE, INC. et al.          :       [Resolving Doc. Nos. 153 & 157]
                                        :
            *Defendants*.               :
                                        :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        Plaintiff Federal Trade Commission (FTC) brings this action against various individuals and

corporations (Defendants), alleging violations of the Federal Trade Commission Act (FTC Act), 15

U.S.C. §§ 41-58, the Telemarketing Sales Rule (TSR), 16 C.F.R. § 310, and the Mortgage Assistance

Relief Services Rule (MARS Rule), 16 C.F.R. § 322.[1]  Generally, Plaintiff says that Defendants

violated these laws through its marketing and sale of debt-related services, such as debt settlement,

loan modification, and mortgage assistance relief.[2]  Plaintiff FTC now moves for summary judgment.

The remaining defendants did not file a response.  For the following reasons, Plaintiff FTC's motion

to admit consumer complaints is DENIED, and Plaintiff FTC's motion for summary judgment is

GRANTED.

_____

        [1]Doc. 1.
        [2]*Id*.

Case No. 1:12-CV-2394
Gwin, J.

## I.  Background

Defendants Dan Michaels and James Benhaim operated a series of related corporations in the United States and Canada.  To make sales, these corporations would contact consumers, use scripted telemarketers to lure the consumers into signing debt consolidation contracts, and then do very little or nothing.  Defendants' telemarketers would tell consumers that they were calling from a current lender's wholesale department (they weren't),[3/] that they had special relationships with the consumer's creditors (they didn't),[4/] or that they could save consumers hundreds of dollars a month (they couldn't).[5/]  Consumers often paid thousands of dollars in up-front fees,[6/] with little to show for it.

In September 2012, the FTC filed the instant complaint and a motion for a temporary restraining order against three American corporations (E.M.A. Nationwide, New Life Financial Solutions, and 1UC), four Canadian corporations (7242701 Canada, 7242697 Canada, 7246293 Canada, and 7246421 Canada), and five individuals (James Benhaim, Dan Michaels, Phillip Hee Min Kwon, Joseph Shamolian, and Nissim Ohayon).[7/]  Over the next few months, the FTC entered into stipulated preliminary injunctions with all Defendants,[8/] and eventually entered into stipulated permanent injunctions with Defendants Kwon[9/] and Shamolian.[10/]

The FTC now moves for summary judgment "against Defendants Dan Michaels, James

---

[3/]Doc. 157-3, at 4.
[4/]*Id.* at 6.
[5/]*Id.* at 4.
[6/]*See, e.g.*, *id.* at 59.
[7/]Doc. 1.
[8/]Docs. 27, 28, 56 and 61.
[9/]Doc. 138.
[10/]Doc. 156.

Case No. 1:12-CV-2394
Gwin, J.

Benhaim, and all seven corporate Defendants."[11]  On the day before their brief in opposition was due,

all three American corporations, three of the four Canadian corporations, and Defendant Michaels

moved for an extension of time to respond.[12]  This Court denied that motion.[13]  Because all

Defendants failed to respond, the FTC's motion for summary judgment is unopposed.

## II.  Analysis

As an initial matter, this Court may not grant Plaintiff's unopposed motion for summary

judgment without conducting its own, searching review.  The Sixth Circuit has said that "a district

court abuses its discretion when it grants summary judgment solely because the non-moving party

has failed to respond to the motion within the applicable time limit."[14]  Rather, the moving party

must independently demonstrate an "absence of a disputed question of material fact and a ground that

would entitle the moving party to judgment as a matter of law."[15]  This Court is therefore "required,

at a minimum, to examine the movant's motion for summary judgment to ensure that he has

discharged that burden."[16]

### 1.  Motion to Admit Consumer Complaints

Before turning to the FTC's motion for summary judgment, the Court first decides whether

it may consider certain evidence.  The FTC asks this Court to admit certain consumer complaints

under Rule 807 of the Federal Rules of Evidence.[17]  The complaints were made by consumers of

---

[11]/Doc. 157.  The FTC says that it is close to a stipulated permanent injunction with Mr. Ohayon.

[12]/Doc. 161.

[13]/Doc. 166.

[14]/*Miller v. Shore Fin. Servs., Inc.*, 141 F. App'x 417, 419 (6th Cir. 2005) (citing *Stough v. Mayville Cmty. Sch.,* 138 F.3d 62, 614 (6th Cir. 1998)).

[15]/*Id.* (citing Fed. R. Civ. P. 56).

[16]/*Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991).

[17]/Doc. 153.

Case No. 1:12-CV-2394
Gwin, J.

Defendants' services and were usually made to consumer protection units in various municipalities

nationwide.  Some contain detailed information about the consumer's contract and debt negotiations,

while others are barely intelligible.  The FTC says that the complaints contain circumstantial

guarantees of trustworthiness.

Rule 807, the residual hearsay exception rule, admits certain hearsay evidence that is not

specifically covered by one of the exceptions contained in Rules 803 and 804.  Under the rule, a

hearsay statement can be admitted if:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it
> is offered as evidence of a material fact; (3) it is more probative on the point for
> which it is offered than any other evidence that the proponent can obtain through
> reasonable efforts; and (4) admitting it will best serve the purposes of these rules and
> the interests of justice.[18]

The Sixth Circuit has allowed the use of Rule 807, even if there is an exception in Rules 803 or 804

that is on point.[19]  This "close-enough theory" permits the admission of hearsay evidence "under the

residual exception even when it just misses admissibility under an established exception."[20]

Regardless, the legislative history of Rule 807 demonstrates that the residual exception is to be "used

very rarely, and only in exceptional circumstances."[21]

The consumer complaints do not have sufficient indicia of trustworthiness.  To be sure, they

were submitted by consumers to government or non-profit organizations, and most consumers may

have made their best efforts to convey accurate information.  But, the consumers often made the

---

[18]Fed. R. Evid. 807.

[19]See United States v. Laster, 258 F.3d 525, 530 (6th Cir. 2001) ("Rather, this court interprets Fed. R. Evid. 807, along with the majority of circuits, to mean that if a statement is admissible under one of the hearsay exceptions, that exception should be relied on instead of the residual exception.") (quotation omitted).

[20]Id. at 534 (Moore, J., dissenting).

[21]Id. at 533 (quoting S.Rep. No. 93-1277, at 20 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7066).

Case No. 1:12-CV-2394
Gwin, J.

complaints with hopes of receiving some type of refund or other financial benefit.[22]  The complaints
were not made under oath.  The complaints allege acts by entities not named in this lawsuit.  And,
the complaints list events that, perhaps not created in anticipation of litigation, were created with
knowledge that litigation was possible.

Taken together, these concerns warrant exclusion of the evidence.  The first requirement for
admission under Rule 807 is that the evidence has "equivalent circumstantial guarantees of
trustworthiness" as evidence admitted under other hearsay exceptions.[23]  But other exceptions have
greater guarantees of trustworthiness than the consumer complaints here.  Rule 803(4), for example,
allows for a statement made for medical diagnosis, because it is unlikely a declarant would lie about
her health in order to gain an advantage in litigation.  Similarly, Rule 803(2) provides for the
admission of an excited utterance if "the declarant was under the stress of excitement" that the
startling event or condition caused.  Underpinning this exception is the belief that a declarant would
not have the time or wherewithal to create falsehoods when faced with imminent danger or shock.
These types of guarantees of truthfulness are simply not present in the consumer complaints.

This is not to say that the consumer complaints necessarily contain false information; rather,
that a hearsay statement is presumed inadmissible unless it fits into one of the enumerated exceptions.
The FTC's motion to admit these unverified consumer complaints is therefore denied.

---

[22]/*See, e.g.*, doc. 153-1, at 3 ("I want my money back $466.00 and out of this agreement as soon as possible");
at 14 ("Investigate Co.  Would like a refund also."); at 21 ("I think my money should be returned since they did not
deliver on promised service."); at 27 ("I would hope that as you deal with the Iowa Attorney General's Office you can
come up with some kind of compensation plan.").

[23]/Fed. R. Evid. 807.

-5-

Case No. 1:12-CV-2394
Gwin, J.

*2. Motion for Summary Judgment*

    A.  Violation of the Federal Trade Commission Act (FTC Act)

    Plaintiff FTC says that Defendants violated Section 5 of the FTC Act by representing that Defendants would obtain for consumers: "debt settlements that will make consumers' payments substantially more affordable" (Count I); "reductions in outstanding principal amounts that will substantially reduce the amount of debt the consumers owe" (Count II); and "mortgage loan modifications that will make consumers' payments substantially more affordable" (Count III).[24]

    Section 5 of the FTC Act gives the FTC the power "to prevent persons, partnerships, or corporations" from using "unfair or deceptive acts or practices in or affecting commerce."[25]  To prove that Defendants violated Section 5 by engaging in deception, Plaintiff FTC "must show that defendants' representations were material and that they were likely to mislead customers acting reasonably under the circumstances."[26]  A representation is material of it is likely to affect the consumer's decision to buy the product being sold, but express claims are presumed to be material.[27]  Further, a fine print disclaimer does not preclude liability under Section 5; rather, "it is the overall net impression that counts."[28]

    Defendants contacted consumers and used the following statements to encourage participation:

---

[24]/Doc. 1, at 14-15.

[25]/15 U.S.C. § 45(a)(2).

[26]/*FTC v. Int'l Computer Concepts, Inc.*, No. 5:94-CV-1678, 1995 WL 767810 at *2 (N.D. Ohio Oct. 24, 1995). *See also FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) ("To establish liability under section 5 of the FTC Act, the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material.").

[27]/*Id.*

[28]/*Id.* at *3.

Case No. 1:12-CV-2394
Gwin, J.

- Hi! (customer's first name), this is (your name) calling from FIRST UNITED CONSULTANTS.  The reason for my call today (customer's name) is because your file has been placed on my desk for review this morning.  It actually came up for review from your current lender and creditors with our wholesale department, regarding your property on [blank] . . . . Now what I do with all of my clients to make sure they are the happiest people in the world, is create what I like to call a "Wish List" of everything they would like in a perfect world, *keeping in mind that we will already be lowering your rate and payment!!!!*[29]

- Now, I want to review your debts with you so that we can get a clear understanding of what we will get done and *how we will save a substantial (or significant) amount of money on a monthly basis*.[30]

- On your mortgage, we will work with 3rd parties whose bank connections with help to reduce your interest rate and monthly payments significantly.[31]

- For student loans, tax debt, medical bills and any other type of debt you have, we work with a team of 3rd party attorneys and firms who specialize in reducing your balances owed, your payments and wiping out this debt in the quickest way possible.[32]

- I'm calling from FIRST UNITED CONSULTANTS today due to your recent credit history. I have your file here on my desk and I see you've been pre-qualified for EXPENSE REDUCTION.[33]

The companies—whether First United, EMA, or New Life Financial—would cold-call consumers, sign them up for services using the sales pitches described above, and then instruct the consumers to stop paying their monthly bills while the company negotiated their debt settlements.[34] During this period, the consumer deposited hundreds or thousands of dollars into what they were told was an escrow account for their debts.  In fact, these deposits were for Defendants' fees.[35] Defendants then turned over the consumer's file to a third party debt negotiation service, who would

---

[29] Doc. 157-3, at 4 (emphasis added).

[30] *Id.* at 8.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 13.

[34] Doc. 5-3, at 4.  In materials sent to the consumer after signing up for Defendants' services, Defendants warned the consumer: "Do not speak to your creditors until you have mapped out a clear solution to the problem."  *Id.* at 48.

[35] *Id.* at 6.

Case No. 1:12-CV-2394
Gwin, J.

also try to exact large fees from the consumer.[36]  This pattern went on,[37] and on,[38] and on.[39]

The Court finds that Plaintiff FTC has satisfied its burden to show that there is no genuine issue of material fact as to whether Defendants made material representations likely to mislead customers.  Defendants' cold-calling was little more than an attempt to find debt-saddled consumers vulnerable to their schemes.   The evidence before this Court, one-sided as it is, shows that Defendants did little to nothing to actually assist their clients.  Defendants have therefore violated Section 5 of the FTC Act as alleged in Counts 1, 2, and 3 of Plaintiff FTC's complaint.

B.  Violations of the Telemarketing Sales Rule (TSR)

Plaintiff FTC says that Defendants violated the TSR when, in the course of telemarketing goods and services, they: misrepresented the total costs of Defendants' services (Count IV); misrepresented central characteristics of Defendants' services (Count V); misrepresented the amount of money that consumers would save (Count VI); charged fees that were disproportionate to the value offered (Count VII); and called numbers on the National Do Not Call Registry (Count VIII).

The TSR refers to the series of federal regulations implementing the Telemarketing and Consumer Fraud and Abuse Prevention Act.[40]  Under the TSR, it is a violation for any telemarketer to engage in, among other things, the following conduct:

•    Misrepresenting . . . the total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer.[41]

•    Misrepresenting  .  .  .  any material aspect of the performance, efficacy, nature, or central

---

[36] *Id.* at 7.
[37] *Id.* at 97 (declaration of Teresita Bayaoa).
[38] *Id.* at 118 (declaration of Gloria Bernardo).
[39] *Id.* at 142 (declaration of Catherine Browning).
[40] 16 C.F.R. § 310.1.
[41] *Id.* at § 310.3(a)(2)(i).

-8-

Case No. 1:12-CV-2394
Gwin, J.

characteristics of goods or services that are the subject of a sales offer.[42]

• Misrepresenting . . . any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service [or] the amount of time necessary to achieve the represented results.[43]

• Requesting or receiving payment of any fee or consideration for any debt relief service until and unless: (A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt [or] (B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and . . . the fee or consideration . . . [b]ears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount.[44]

• Initiating any outbound telephone call to a person when . . . that person's telephone number is on the "do-not-call" registry.[45]

Plaintiff FTC gives evidence that satisfies its burden to show that no genuine issue of material fact exists as to whether Defendants violated these regulations. Vivian Allen, a former customer of New Life Financial, states in her affidavit that New Life Financial's employees told her that "the only fees for New Life Financial's services would be $6 per month for four months, and a one-time closing fee of $40."[46] The employee told Allen that New Life Financial made its money on the negotiated debt. This evidence supports a finding of a violation of § 310.3(a)(2)(i) (misrepresenting total cost) and § 310.3(a)(2)(iii) (misrepresenting material aspect of performance).

The FTC also offers a phone call transcript between one of its investigators, John Vega, and an employee from First United Consultants.[47]   During the call, an employee told Vega that

---

[42]/*Id.* at § 310.3(a)(2)(iii).

[43]/*Id.* at § 310.3(a)(2)(x). This provision became effective on September 27, 2010. The Court will only consider acts alleged to have violated this provision that occurred after that date.

[44]/*Id.* at § 310.4(a)(5). This provision became effective on October 27, 2010. The Court will only consider acts alleged to have violated this provision that occurred after that date.

[45]/*Id.* at § 310.4(b)(1)(iii)(B).

[46]/Doc. 5-3, at 4.

[47]/Doc. 5-2, at 192.

-9-

Case No. 1:12-CV-2394
Gwin, J.

Defendants could reduce Vega's $25,000 in credit card debt by up to seventy percent.[48] Other scripts used by Defendant EMA instructed employees to say they were calling "on behalf of" "the Obama Debt Relief Initiative" to inform the consumer that they could help cut their "debt by 50% OR MORE!!!"[49] Defendant EMA also contacted Tiffanie Young, telling her that EMA would relieve between sixty and sixty-five percent of her debt, and that she would only be charged $215.65. Young ended up paying $1,078.25 in fees, and received no assistance.[50] This evidence supports a finding of a violation of § 310.3(a)(2)(x) (misrepresenting amount of assistance) and § 310.4(a)(5) (receiving fees prior to any debt settlement or negotiation).

Finally, the FTC puts forth a number of examples of violations of the Do Not Call regulations. Tiffanie Young says that she received a call from EMA, even though her telephone number is registered on the Do Not Call registry, and she did not have a business relationship with EMA at the time of the initial call.[51] Vivian Allen[52] and Gregory Bauer say the same.[53] The FTC also produced records showing close to a thousand complaints of Defendants' violations of the Do Not Call requirements. This evidence supports a finding of a violation of § 310.4(b)(1)(iii)(B).

C. Violations of the Mortgage Assistance Relief Services Rule (MARS Rule)

Plaintiff FTC says that Defendants violated the MARS Rule when Defendants: requested payment prior to an agreement being reached between the consumer and her loan holder (Count IX); told consumers not to contact her loan holder or servicer (Count X); misrepresenting the likelihood

---

[48] *Id.* at 209.
[49] *Id.* at 174 (emphasis in original).
[50] Doc. 5-5, at 7.
[51] *Id.*
[52] Doc. 5-3, at 3.
[53] *Id.* at 93.

Case No. 1:12-CV-2394
Gwin, J.

of obtaining mortgage relief assistance (Count XI); and by failing to make necessary disclosures

(Count XII).

The MARS Rule prohibits entities offering mortgage relief from engaging in certain deceptive

acts.  Under the Rule, a "mortgage assistance relief service" is defined as "any service, plan, or

program, offered or provided to the consumer in exchange for consideration, that is represented,

expressly or by implication, to assist or attempt to assist the consumer" with her dwelling loan.  As

demonstrated through the evidence described above, Defendants qualify under this definition.  They

are therefore prohibited from:

- Representing, expressly or by implication, in connection with the advertising, marketing, promotion, offering for sale, sale, or performance of any mortgage assistance relief service, that a consumer cannot or should not contact or communicate with his or her lender or servicer.[54]

- Request[ing] or receiving] payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder or servicer incorporating the offer of mortgage assistance relief the provider obtained from the consumer's dwelling loan holder or servicer.[55]

- Misrepresenting, expressly or by implication, any material aspect of any mortgage assistance relief service, including . . . [t]he likelihood of negotiating, obtaining, or arranging any represented service or result [or that a service is affiliated with] the United States government.[56]

Additionally, these providers must disclose that their company is not associated with the government,

that the lender may not change the loan terms, that the consumer may stop doing business with the

service provider at any time, and that the consumer can refuse to pay the service provider if the

lender's offer is rejected.[57]

---

[54] 12 C.F.R. § 1015.3 (a).

[55] *Id.* at § 1015.5(a).

[56] *Id.* at 1015.3(b).

[57] *See generally id.* at § 1015.4.

-11-

Case No. 1:12-CV-2394
Gwin, J.

Plaintiff FTC puts forth sufficient evidence to meet its burden that no genuine issue of material fact exists and that Defendants violated the MARS Rule.  As already explained, Defendants told consumers not to contact their lenders and to let Defendants do all the talking;[58] requested fees from consumers prior to any agreement between the consumer and her loan holder;[59] and misrepresented the types of results that consumers might enjoy.[60]  Further, as evidenced by the transcript of the conversation with the FTC's investigator, Defendants failed to make the necessary disclosures.[61]  Defendants have therefore violated the MARS Rule as alleged in Counts 9 through 12 of Plaintiff FTC's complaint.

    D.  Joint & Several Liability

Plaintiff FTC says that all of the corporate Defendants acted as a common enterprise, and that Defendants Michael and Benhaim should be held personally liable for the acts of the corporate Defendants.  Effectively, Plaintiff asks the Court to disregard the formal corporate structures separating the individual corporate Defendants from each other, and from the individual personal Defendants.

The FTC's theory that the corporate Defendants operated as a "common enterprise," does not find support in this Circuit.  The most analogous theory in the Sixth Circuit is the "alter ego" theory, which asserts that Defendant A and Defendant B are the same entity.[62]  But, the alter ego theory has been applied primarily to attempts by a corporate defendant to shirk its labor obligations through

---

[58]/Doc. 5-3, at 118 (declaration of Gloria Bernardo).

[59]/*Id.*

[60]/*Id.* at 180 (declaration of Elisea Cadaoas).

[61]/Doc. 5-2, at 200-09.

[62]/*Board of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.,* 212 F.3d 1031, 1038 (6th Cir. 2000).  A finding that two entities are alter egos of one another permits direct, as opposed to vicarious, liability.

Case No. 1:12-CV-2394
Gwin, J.

reincorporation.[63/]  Regardless, this Court finds persuasive the positions held by courts in the First and Second Circuits.  Under this position, "[i]f the structure, organization, and pattern of a business venture reveal a 'common' enterprise or a 'maze' of integrated business entities, the FTC Act disregards corporateness."[64/]  Factors to consider include whether the businesses "(1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing."[65/]

The evidence is overwhelming.  Benhaim sent e-mails concerning the administration of New Life Financial, but signed them as "President, E.M.A."[66/]  One of the Canadian corporations—7246293 Canada, Inc.—paid wages to employees of First United, New Life Financial, and EMA.[67/]  That entity's accounts were funded from transfers from American accounts in the name of EMA, First United Consultants, and New Life Financial.[68/]

Additionally, bank records show that the numerically-named Canadian corporate Defendants transferred money frequently among themselves.[69/]  Complaints from customers of New Life Financial were forwarded to EMA employees, and the websites for EMA, New Life Financial, and First United Consultants were all registered by Defendant Dan Michaels.[70/]  Finally, communications from the individual defendants to third party vendors identified common control over EMA, New

---

[63/] *Id.*

[64/] *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012) (citing Delaware Watch Co. v. FTC, 332 F.2d 745, 746 (2d Cir.1964) and *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir.1973)).

[65/] *Id.*

[66/] Doc. 157-4, at 108.

[67/] Doc. 157-2, at 31-33.

[68/] Doc. 157-5, at 4.

[69/] *Id.* at 136.

[70/] Doc. 157-6, at 268.

-13-

Case No. 1:12-CV-2394
Gwin, J.

Life, and First United.[71/]

This small snapshot of the overall record demonstrates that the corporate Defendants were a maze of interrelated entities.  They shared common officers and ownership, commingled funds, and ignored any corporate formalities when dealing with third parties.  The Court therefore finds that the seven corporate Defendants acted as a common enterprise.

To show that Defendants Benhaim and Michaels should be personally liable for injunctive relief for a corporation's violations, the FTC must prove two elements: "[f]irst, the FTC must show that corporate liability exists in that consumer injury resulted from consumers' reasonable reliance on the business practices involving misrepresentations or omissions;" second, "the FTC must show that the individual defendants actively participated in or had some measure of control over a corporation's deceptive practices."[72/]  The individual defendants can then be held personally liable for monetary restitution upon a showing "that the defendants had or should have had knowledge or awareness of the misrepresentations."[73/]  This knowledge requirement can be met by showing that the individual defendants knew or were aware of the misrepresentations.[74/]  Active participation in the business is probative of knowledge, and direct participation in the misrepresentation is not required.[75/]

The first element, as discussed in the previous pages of this opinion, has been proven.  Consumers were harmed by Defendants' deceptive behavior.  Many paid thousands of dollars for nothing, and some lost, or came close to losing, their homes as a result.

---

[71/]Doc. 157-4, at 43 (e-mail from Benhaim to its payment processor: "We are encountering a major issue with one of our partners and immediately require a stop of all fund transfers to our bank of america [sic] accounts for EMA Nationwide, New Life and 1UC.  We need to do a change of ownership of all the [vendor] accounts to a new owner.").

[72/]*Int'l Computer Concepts*, 1994 WL 730144, at *15.

[73/]*Id.* at *16 (quotation omitted).

[74/]*Id.*

[75/]*Id.*

-14-

Case No. 1:12-CV-2394
Gwin, J.

The second element—that Benhaim and Michaels "had some measure of control over [the] corporation's deceptive practices"—is also met. Defendants continually reincorporated their businesses in order to evade review by state authorities confronted with consumer complaints.[76] Further, Defendants communicated with third party vendors to set up processors for consumers' payments.[77] Benhaim and Michaels also listed themselves as "VP Operations" and "President" of First United Consultants, respectively.[78] There is no genuine issue of material fact as to whether these Defendants exerted some measure of control over the deceptive practices.

The third element—that Benhaim and Michaels "knew or were aware of the misrepresentations"—is also met. Evidence shows that the individual defendants knew of problems that consumers were having with the debt relief providers, and that the individual defendants regularly received large transfers of money into their personal accounts.[79] Documents show that Benhaim clearly knew of consumers' problems. As for Michaels, although his e-mail address does not appear on the consumer complaint forms sent to the corporate Defendants, there are numerous requests for large transfers of money from the corporate accounts to his individual account. Further, it is undisputed that he was involved in the business. Therefore, the Court finds that the third element has also been met for both Benhaim and Michaels.

Therefore, as all three elements have been met, Defendants Benhaim and Michaels are personally liable for both the injunctive relief and restitution ordered by this Court.

---

[76]/Doc. 5-2, at 7 (EMA's profit report with Michaels as the registered agent); at 19 (New Life Financial's profit report with Michaels as the registered agent); at 33 (Michaels as the agent for 7242701 Canada); at 38 (Benhaim as the agent for 7242697 Canada).

[77]/*Id.* at 119.

[78]/*Id.* at 142.

[79]/*See generally* doc. 157-7 ("Please transfer the amount of $50,000.00 from 7246293 Canada Inc . . . to Dan Michles Holding account 7242701 Canada Inc."); at 34 ($150,000 to "Dan's Personal USD Holding Account").

-15-

Case No. 1:12-CV-2394
Gwin, J.

  E. Restitution

  "District courts are afforded wide discretion in fashioning an equitable remedy for civil contempt."[80/] "In exercising its broad discretion in fashioning a remedy for civil contempt, the Court may order restitution to victims or disgorgement of profits to deprive the wrongdoer of his ill-gotten gain."[81/] Generally, the appropriate amount of restitution in consumer redress cases is the full purchase price of the product, less refunds paid.[82/]

  Records from Defendants' payment processors demonstrate that Defendants received a total of $10,079,706.82 in payments.[83/] Of this amount, $4,373,571.34 is reflected in returned payments and refunds. This difference yields a total net revenue of $5,706,135.48. The Court finds that the FTC has "sufficiently justified a restitution award of net consumer losses."[84/] At this point, the burden shifts to Defendants to show that the FTC's calculations are inaccurate.[85/] Defendant's failure to file a brief in opposition to Plaintiff's motion for summary judgment precludes them from doing this.

### III. Conclusion

  For the foregoing reasons, the Court DENIES Plaintiff FTC's motion to admit consumer complaints and GRANTS Plaintiff FTC's motion for summary judgment. The Court orders Defendants to pay restitution in the amount of $5,706,135.48, jointly and severally, to be returned to consumers injured by Defendants' deceptive practices. Further, the Court permanently enjoins

---

[80/] *McGregor v. Chierco*, 206 F.3d 1378, 1385 n. 5 (11th Cir. 2000).

[81/] *FTC v. Vocational Guides, Inc.*, No. 3:01-CV-0170, 2006 WL 3254517, at *17 (M.D. Tenn. Nov. 9, 2006).

[82/] *FTC v. Renaissance Fine Arts, Ltd.*, 1995 WL 523619, at *2 (N.D. Ohio 1995).

[83/] Doc. 157-2, at 12-21.

[84/] *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d. 975, 1013 (N.D. Cal. 2010).

[85/] *Id.*

Case No. 1:12-CV-2394
Gwin, J.

Defendants from working in the debt relief and mortgage assistance industries.

      IT IS SO ORDERED.


Dated: August 26, 2013               s/       *James S. Gwin*
                                       JAMES S. GWIN
                                       UNITED STATES DISTRICT JUDGE